People v Garland (2018 NY Slip Op 07927)

People v Garland

2018 NY Slip Op 07927 [32 NY3d 1094]

November 20, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, January 30, 2019

[*1]

The People of the State of New York, Respondent,
v
Tamarkqua Garland, Appellant.

Decided November 20, 2018

People v Garland, 155 AD3d 527, affirmed.

APPEARANCES OF COUNSEL

Robert S. Dean, Center for Appellate Litigation, New York City (David Bernstein of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (James J. Wen of counsel), for respondent.

{**32 NY3d at 1095} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be affirmed. Defendant challenges his first-degree assault convictions, arguing that the evidence against him was not legally sufficient to establish the element of "serious physical injury" (Penal Law § 120.10 [1], [3]). Serious physical injury means "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]). In reviewing a legal sufficiency claim, the Court must "view[ ] the facts in a light most favorable to the People" to determine "whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (People v Danielson, 9 NY3d 342, 349 [2007]). This "deferential standard" is satisfied so long as "there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Acosta, 80 NY2d 665, 672 [1993] [internal quotation marks and citation omitted]).
In this case, defendant fired five shots into a crowd and struck a 15-year-old bystander in the leg. According to medical records, the bullet was "lodged in the soft tissues of the [victim's] leg." An X ray showed two fragments of the bullet "on the side towards the front of the thigh," and the possibility of multiple other, smaller fragments. The [*2]victim testified at trial that, after the shooting, the injury hurt and he was bleeding a lot. He "had crutches for about two months" and, "after that, there was a lot of limping, crutches in the shower." The victim indicated that the ordeal was "[v]ery traumatizing."
The bullet fragments were never removed from the victim's leg. Medical records indicated that the injury was close to the victim's femoral artery—a "big blood vessel"—and, as a medical expert testified at trial, "where a bullet enters an extremity, we don't take the bullet out in the trauma situations" because "going after a bullet like this can cause further injury." In particular, where a bullet is "lodged near a blood vessel . . . , actually taking it out can cause injury to that blood vessel and near around it," resulting in "bleeding," "neurological deficit," "numbness," "tingling," and "weakness." The expert further noted that, had "the femoral artery . . . been struck with a bullet," possible medical complications could include "exsanguinating, bleeding, excessive bleeding" and "possibly loss of limb."
{**32 NY3d at 1096}The victim testified that he can still "feel [the bullet] poking out," and that he continues to endure the effects "of the metal inside [his] leg." Even four years after the shooting, the victim noted that the injury still "disturbs" him at times, and that "something is wrong with [his] leg." The victim stated that, because the bullet "didn't come out of [his] leg," his "life" had been "tampered with." For instance, he can no longer participate in competitive sports, as the injury would present a "very, very, very, very big risk." The medical expert further testified that there are "many repercussions" of the type of muscle damage that the victim sustained: "Muscle damage can cause long-term injuries to the kidneys from leakage of chemicals from the muscle, toxic to the kidneys, can cause pain and weakness, difficulty walking."
As the dissent notes, there is certainly record evidence favorable to the defense that, when viewed in isolation, might have presented an issue of fact for the jury. That said, viewing the evidence in the light most favorable to the People, as our legal sufficiency standard requires, we have no trouble concluding that the jury acted rationally in finding that the victim's gunshot wound constituted a "serious physical injury" (Penal Law § 10.00 [10]).
We have considered defendant's remaining contentions and conclude that they are without merit.

Wilson, J. (dissenting).
The Penal Law quite sensibly establishes various gradations of severity for assault, with the punishment increasing as the severity increases. Setting aside various types of assault involving circumstances not present here,[FN1] [*3]assault, like many other crimes, falls into the first, second and third degrees. As relevant here, assault in the first degree requires either: (i) "[w]ith intent to cause serious physical injury to another person, [the defendant] causes such injury to such{**32 NY3d at 1097} person or to a third person by means of a deadly weapon or a dangerous instrument," or (ii) "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person" (Penal Law § 120.10 [1], [3]). Assault in the second degree requires: "[w]ith intent to cause physical injury to another person, [the defendant] causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.05 [2]). Assault in the third degree reaches physical injury caused either recklessly or with criminal negligence by use of a deadly weapon or dangerous instrument (Penal Law § 120.00). What level of assault a defendant may properly be convicted of, then, turns on a combination of that defendant's intent, the actual injury caused, and the use of a deadly weapon.
Whether Mr. Garland's conviction for first-degree assault can be sustained turns on whether Mr. Bethea, who has bullet fragments lodged in his leg, suffered a "serious physical injury." Here, the evidence is legally insufficient to show that Mr. Bethea suffered a "serious" physical injury. We do not have to guess at what the legislature meant in distinguishing "serious physical injury" from "physical injury." Penal Law § 10.00 (10) defines serious physical injury as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." "Physical injury," on the other hand, is defined as "impairment of physical condition or substantial pain" (Penal Law § 10.00 [9]).
The evidence of the victim's injury is as follows. At around 5:30 p.m., while walking past a group of people he did not know, the victim believed he had been shot by a BB gun because "the bullet hole was so little." He did not notice any blood and spent a while examining his leg before going to the hospital, arriving there around 6:20 p.m. An X ray of the victim's left thigh showed metal fragments but no fractures or neurovascular damage. He told the hospital staff that he had no numbness and was not suffering from any motor functions deficits. At 9:30 p.m., the victim described his pain level as being a 7 out of 10. By 11:50 p.m., he said it was 0 out of 10. The victim was not prescribed any pain medication upon discharge that night; he was prescribed antibiotics and given a tetanus shot. He was discharged with crutches that he used for two months. The metal fragments were never removed from his leg.
When asked how long after the shooting he felt pain in his leg, the victim responded: "Probably like every other day like trying to do activity involving my leg or something, like running or basketball, you feel slight pain when you're overdoing it, I guess." At trial, four years after the shooting, when asked{**32 NY3d at 1098} if his leg was "back to a hundred percent," he testified: "No, still have little problems, like it will be sore at night. When it rains it disturbs me."
The People's medical expert testified it was "pretty protocol" not to remove the fragments because removal could cause further injury. The expert further testified that if the bullet had struck the femoral artery, it could have had severe health consequences, but told the court that his femoral artery was not injured, according to the hospital records. She stated that "possible" effects from a bullet protruding through nerves could cause "injuries to the kidneys from leakage of chemicals from the muscle, toxic to the kidneys, can cause pain and weakness, difficulty walking," though she did not testify that the fragments had protruded through nerves. She further testified that the X rays revealed no fractures, and no neurovascular or nerve damage. She acknowledged that she had never examined the victim and had not seen any medical records of his dated after 2010, when the shooting occurred. She concluded by saying that she was not able to testify that he had suffered any permanent disability.
The victim is not at substantial risk of dying; he has no serious disfigurement; he has no protracted health impairment and has not lost the function of any bodily organ. The record contains nothing that would meet the statutory definition of "serious physical injury." Our only decision bearing directly on that definition is People v Stewart, in which we held that "serious physical injury" is not satisfied by "complaints of persisting discomfort unconnected to ascertainable health impairment" (18 NY3d 831, 833 [2011]). In Stewart, the victim suffered numerous [*4]blows from a sharp instrument. The wounds were described as "superficial" by an emergency room physician, and no organ damage was evident. The victim described still feeling daily pain from the scars, much as Mr. Bethea claims "slight pain when . . . overdoing it" or when it rains.
The lower courts have generally hewed to the legislature's language and ours in Stewart. For example, in People v Horton (9 AD3d 503 [3d Dept 2004]), the victim had been shot in the neck, bullet fragments remained in his body, but the gunshot wound did not injure his esophagus, trachea, or major blood vessels or nerves. The Court held those injuries did not constitute "serious physical injury." In People v Matthews (59 Misc 3d 1218[A], 2018 NY Slip Op 50615[U] [Sup Ct, NY County 2018]), the victim was shot at point-blank range in his abdomen, but{**32 NY3d at 1099} the bullet missed his major organs. Although the shooting caused an infection, the injury did not meet Penal Law § 10.00 (10)'s standard because no substantial risk of death was ever present (2018 NY Slip Op 50615[U],{**32 NY3d at 5} *5). Similarly, the injuries in People v Castillo were deemed insufficiently serious, even though the victim had two stab wounds that required sutures and said at trial, 18 months after the incident, that his injuries hurt when the weather changed (199 AD2d 276 [2d Dept 1993]). In People v Daniels (97 AD3d 845 [3d Dept 2012]), the Court held the victim had not suffered a serious physical injury although the victim was stabbed and had a concussion, but six months later said she could still play soccer despite a sore knee. In People v Adames, the victim was stabbed in the chest and back, but those injuries and her testimony that her scars still hurt were insufficient to constitute a "serious physical injury" (52 AD3d 617 [2d Dept 2008]).
One instructive comparison is to our decisions in "no-fault" automobile insurance cases. We regularly reject the sort of evidence of injury the victim here suffered as sufficient to support a jury verdict for the plaintiff; often we deem it insufficient to create a triable issue of fact as to whether an injury was serious (see e.g. Lopez v Senatore, 65 NY2d 1017 [1985]; Gaddy v Eyler, 79 NY2d 955 [1992]; Scheer v Koubek, 70 NY2d 678 [1987]). The Insurance Law's definition of "serious injury" is quite similar to the definition of "serious physical injury" in Penal Law § 10.00 (10).[FN2] The plaintiffs in those cases, of course, have a much lower burden of proof than do the People here, who must prove the seriousness of the physical injury beyond a reasonable doubt. Nevertheless, disregarding the kind of analysis we regularly employ in those cases, the majority concludes that the victim's "slight pain" and "little problems" are legally sufficient to establish "serious physical injury."
The requirements set out in Stewart are similar to our approach in the no-fault context, where we have said that "subjective {**32 NY3d at 1100}complaints alone are not sufficient" to establish serious injury, and that claims must be supported by "objective evidence" (Toure v Avis Rent A Car Sys., 98 NY2d 345, 350-351 [2002]). Of course, the crucial difference between that regime and the elements required in assault statutes is that no-fault cases are civil, and criminal prosecutions require a much higher standard of evidentiary proof than civil suits. The majority's opinion rests on less, based on assertions that are trivial or wholly speculative. We would not, in a no-fault or malpractice case, accept evidence about a plaintiff's injury from a doctor who had never examined a patient and whose most recent review of medical records was four years distant.[FN3]
Someone who shoots into a crowd and strikes an innocent teenager deserves to be harshly punished. But the legislature, not the courts, has the responsibility to enact statutes criminalizing behavior and prescribing ranges of punishments. The legislature has determined that the degree of actual injury to the victim is a crucial determinant of the amount of punishment to be meted out—even if the insubstantiality of the injury is the result of pure dumb luck. The legislature has dealt with the use of a firearm to cause an injury separately, which is why second-degree assault can be established either by causing serious physical injury, or by causing physical injury by use of a deadly weapon. The legislature has also attached a separate, substantial penalty (up to 15 years of imprisonment) to possession of a handgun, of which Mr. Garland was convicted. Those are legislative enactments to which we should adhere. Mr. Garland's maximum sentence for second-degree assault is seven years; for first-degree assault, it is 25. By treating what is plainly not a serious physical injury as if it were, we are shredding the statutory scheme adopted by the legislature and{**32 NY3d at 1101} imposing one of our own making. I would vacate his first-degree assault convictions (leaving intact his conviction for criminal possession of a weapon in the second degree) and remit the case for further proceedings.
Accordingly, I dissent.
Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur; Judge Wilson dissents in an opinion in which Judge Rivera concurs.
On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals (22 NYCRR 500.11), order affirmed, in a memorandum.

Footnotes

Footnote 1:E.g. Penal Law §§ 120.01 (reckless assault of a child by child day care provider), 120.04 (vehicular assault in the first degree), 120.09 (assault on a judge).

Footnote 2:See Insurance Law § 5102 (d) (" 'Serious injury' means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment").

Footnote 3:See Toure, 98 NY2d 345, 357-358 ("objective evidence in support of a serious injury . . . must be objectively ascertained. This requirement was not satisfied by the testimony of plaintiff's expert that he detected a spasm, where he did not, for example, indicate what test, if any, he performed to induce the spasm. Furthermore, Dr. Patriarco testified on cross-examination that the tests he administered to reach his conclusion regarding plaintiff's limitation of motion were subjective in nature as they relied on plaintiff's complaints of pain"); Gaddy v Eyler, 79 NY2d 955, 957-958 (1992) ("the mere repetition of the word 'permanent' in the affidavit of plaintiff's treating physician—prepared two years after his last examination and consisting of conclusory assertions tailored to meet the statutory requirements—is insufficient to establish 'serious injury' " [citation omitted]). I am unable to find any case where this Court found it sufficient to prove a present injury by the testimony of a physician who never examined the injured person and relied on records that were several years old.